## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| THE SHERWIN-WILLIAMS COMPANY, | Case No. 1:24-cv-1004 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| JADE MUNS, | |
| Defendant, | |
| and | |
| AKZO NOBEL, INC., | |
| and | |
| Defendant. | |

### COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

Plaintiff The Sherwin-Williams Company ("Sherwin-Williams") brings this action to enforce the terms of the Employee Agreement—including non-compete and customer non-solicitation provisions—signed by former employee Jade Muns ("Muns"), who in violation of that Agreement, accepted a research and development level role with direct competitor Akzo Nobel, Inc. ("Akzo"), which is a sole substantially similar to the one she held at Sherwin-Williams. Sherwin-Williams also brings this action to protect its trade secret information from imminent misappropriation and inevitable use and disclosure by Muns, who was responsible for the ground-up development of Sherwin-Williams' radiation-cure coil coating system; to and for the benefit of her future employer, Akzo, which intends to use Sherwin-Williams' trade secrets to develop a competing product and lure away one of Sherwin-William's most significant customers in its coil coating business segment.  Sherwin-Williams asserts as follows in support of its claims.

1

## INTRODUCTION

1.     In March 2014, The Valspar Corporation (later acquired by Sherwin-Williams) hired promising young chemist Jade Muns to work in its Garland, Texas research and development lab.  Muns showed early potential in the role, earning raises and recognitions before Sherwin-Williams offered her a major promotion and raise in March 2018.  With the promotion and new title of Chemist II came a nearly 20% pay raise and the opportunity for Muns to transfer to a cutting-edge research facility in Minneapolis, Minnesota, where Muns would work on Sherwin-Williams' new and innovative product initiatives.  It also came with more responsibility for and access to Sherwin-Williams' most valuable business information.  To protect that information, as well as the information Muns would develop in her new role, Sherwin-Williams required Muns, as a condition to receiving her raise and a promotion, to sign an Employee Agreement with strong confidentiality provision and restrictive covenants—including two-year non-competition and customer non-solicitation provisions—ensuring that Muns would not leave Sherwin-Williams and use and disclose the company's most valuable intellectual property for a competitor in the same product lines or technologies she was going to be developing or solicit the customers with whom she would become intimately familiar.

In early 2020, Muns was assigned to lead the development of a brand new line of products known as the radiation-cure coil coating system.  Radiation-cure products were brand new in the coil coating business, putting Muns in the unique position of creating a set of first-of-their-kind products from the ground up.  Sherwin-Williams was all in, both on Muns and on this initiative, investing well over $1 million to give Muns the equipment and team of scientists and other support she would need to advance the project.  Muns and her team endeavored for almost three years to bring a radiation-cure coil coating system to market and, in particular, to the first of their customers

to commit to radiation-cured products.  Muns continued to work with that customer to refine Sherwin-Williams' system and to tailor it to the machinery, manufacturing process, and needs of that customer and its projects.  Muns became a trusted advisor and integral part of that customer's own product development.

By early 2023, Sherwin-Williams had established itself as a leading innovator in the field of coil coatings, having created and improved its radiation-cure line and building out its customer base.  Its success is attributable to Muns and her team, and also to the trade secrets that they developed for the benefit of Sherwin-Williams, which provided Sherwin-Williams with a competitive advantage that it earned and paid for and allowed Sherwin-Williams to maintain its place as one of the few companies in the United States to offer a radiation-cure coil coating system.  Those trade secrets included the chemical composition of the radiation-cure coil coating system, techniques for the application of the products to rolled steel, results and findings from years of research and development, testing processes and markers, and the network of suppliers and contractors providing products and support essential for the continued development of Sherwin-Williams' unique and-market leading product lines.  In late July 2023, Muns brought her experience and trade secret knowledge to another promotion, this time in Sherwin-Williams' Wood Coating business unit.

Then, in May 2024, Muns she told Sherwin-Williams that she would be leaving the company to take a position with Akzo, Sherwin-Williams' long-time competitor in a number of product markets.  Akzo for many years has been absent from the radiation-cure coil coatings market, dropping out of the race to develop such products early on and at a time when Sherwin-Williams chose to make huge financial investments.  Now, having chosen not to invest its own money to develop a radiation-cure coil coating line, it apparently intends to replicate Sherwin-

Williams' line, hiring Muns at a much lower cost than it would have had to pay to develop its own radiation-cure coil coatings.  Ignoring contractual obligations and promise not to compete with Sherwin-Williams or solicit its customers, Muns will be joining Akzo's Strongsville, Ohio research and development center, which in (Akzo's words) "includes specialized laboratories for … coil coating research" and supports Akzo's Coil and Extrusion Coatings Segment—exactly the sort of position where Muns could recreate Sherwin-Williams' radiation-cure coil coating system for marketing under the Akzo name.  Sherwin-Williams' coil coating business now is under imminent threat, with Sherwin-Williams learning that Akzo (if not Muns herself) already has reached out to Sherwin-Williams' largest radiation-cure customer to share the news of Akzo's new hire and entry into the radiation-cure coil coating market.

## THE PARTIES

2.      Plaintiff Sherwin-Williams is the leading manufacturer and distributor of paints, coatings, floor coverings, and related products in various residential and industrial markets throughout the world.  Sherwin-Williams is an Ohio corporation with a principal place of business in Cleveland, Ohio.

3.      Defendant Jade Muns is an adult woman who, when last employed by Sherwin-Williams, was a resident of North Carolina.  Muns recently accepted a position of employment with Akzo and will be assigned to work out of Akzo's research and development center in Strongsville, Ohio.

4.      Defendant Akzo is a Delaware corporation, which is registered to do business in the State of Ohio, and which maintains a domestic principal place of business located in Nashville, Tennessee.  Akzo owns and operates a research and development facility in Strongsville, Ohio that specializes in metal coatings research and development.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 18 U.S.C. § 1836(c) because Sherwin-Williams brings a claim against Muns under the Defend Trade Secrets Act, codified at 18 U.S.C. § 1836.  This Court has the authority to exercise supplemental jurisdiction over Sherwin-Williams' state law claims.  *See* 28 U.S.C. § 1367(a).

6.     This Court can exercise personal jurisdiction over Muns based on the exclusive forum selection clause contained in Muns' Employee Agreement, which she executed in March 2018 in exchange for a promotion, pay raise, and other additional consideration.  That Agreement provides that Muns "irrevocably agree[s] and consent[s] to the exercise of personal jurisdiction over [her] by the Ohio state district courts located in Cuyahoga County, Ohio in any action brought by Sherwin-Williams and agree[s] to waive any rights [she] may otherwise have to challenge such court's exercise of personal jurisdiction."  Exhibit A (Muns' Employee Agreement) at ¶ 8.  The Court separately may exercise personal jurisdiction over Muns because Muns' contacts with Ohio—namely, her application to and hire by Akzo in Akzo's Strongsville, Ohio research and development facility—specifically give rise to Sherwin-Williams' present claims against her.

7.     This Court also can exercise personal jurisdiction over Akzo, as Akzo operates at least four independent facilities in the State of Ohio (including one to which it intends to assign Muns after her hire) and therefore regularly and voluntarily conducts business in this jurisdiction.

8.     This Court is the proper venue for this dispute based on the exclusive venue selection clause contained in Muns' Employee Agreement.  As set forth in that Agreement, Muns "irrevocably consent[ed] to the Ohio state district court located in Cuyahoga County, Ohio as the sole and exclusive venue for resolving" disputes "arising out of or in any way related to" the

Employee Agreement.  Exhibit A  (Muns' Employee Agreement) at ¶ 8; *see* 28 U.S.C. § 1404(a) (case may be transferred to "any district or division to which all parties have consented").

9.      Separately, this Court also is the proper venue for this dispute because Akzo operates a manufacturing facility in Huron, Ohio, just 50 miles away from Cleveland.   Akzo therefore resides in this District for the purpose of venue as set forth in 28 U.S. Code § 1391(b)(1) and (c)(2).  *See Amos v. Aetna Life Ins. Co*., No. 2:19-CV-202, 2019 WL 3773770, at *2 n. 1 (S.D. Ohio Aug. 12, 2019) (company has operations within district and therefore "resides or may be found" in the district).

## FACTS

### A.      Sherwin-Williams is a Leader in Coil Coating and Radiation-Cure Products.

10.      Sherwin-Williams is a world leader in paint and coating products, including coil-coating products and technologies.

11.      Coil coating is the process for coating long, thin, sheets of flattened steel (the coils) with multiple levels of primer, paint, and top coat (the coating system) and then curing the coating to particular specifications in preparation for any number of applications, primarily in construction or manufacturing of automotives and household appliances.

12.      Coils are stored and moved in tightly-wound spools, similar to a large roll of paper towels, before they are delivered to commercial customers for processing and coating.  When they ready for processing, coils are unwound, and the flattened steel is passed through machinery where it is cleaned and prepared for application of a coating system.

13.      Sherwin Williams' coating system, which typically is applied using the customer's machinery at the customer's location, consists of multiple layers.  The system includes, depending on the project, a primer, polyester base coat, and clear topcoat.

14.     Coatings used for steel coils are specially formulated to enhance particular characteristics, including durability, flexibility, and color-fastness.  For example, steel coil used for construction—like to build a sheet metal roof—must stand up to extended periods of direct sunlight and unpredictable weather without losing color, exterior gloss, or adhesion to the steel on which it was applied.

15.     Once the coil is coated using a coating system, it is cured using specialized techniques.  Manufacturers historically have utilized a process called thermal curing, which involves running the coil of unrolled, painted steel through an oven raised as high as 700ºF.

16.     After the coil is coated and cured, it is "formed" for its end purpose.  The forming process involves wrapping sheet metal around a model in order for the sheet metal to take a particular shape.  In creating a metal roof, for instance, the sheet metal is pressed around a form that creates the ridges and lines known to facilitate ventilation and water management.

17.     The thermal cure process is a common and relatively well-established practice in the coil coating market, with about a half-dozen U.S. companies providing thermal-cure coil coating systems to end users.  For that reason, thermal cure systems largely have become commoditized, with market competitors offering similar products and services.

18.     In early 2020, however, Sherwin-Williams emerged as an innovator in the coil coating industry by becoming one of the first to invest in the development of a cutting-edge radiation-cure coil coating system. Sherwin-Williams' radiation-cure coil coating system involves five layers of coating, each specifically formulated for the radiation-cure process, with the final layer being an electron-beam clear topcoat.  That topcoat responds to an electron beam, rather than extreme heat, to cure.  Curing by electron beam is up to 90% faster than thermal curing and uses a small fraction of the energy required by a thermal-curing system.  For that reason, Sherwin-

Williams' radiation-cure coil coating system is a more sustainable and environmentally-friendly alternative to its thermal-cure counterpart.

19.     Few companies have taken steps to develop a radiation-cure coating system for a number of reasons.  First, the equipment needed to manufacture and test a radiation-cure system (like an electron-beam curing unit) is extraordinarily expensive, with certain pieces of essential equipment costing hundreds of thousands of dollars apiece.  Second, because the radiation-cure process is new to the market, a manufacturer must build its products and technology from the ground up, meaning additional and ongoing investment in research and development, as well as the talent needed to facilitate it.  Third, development of a radiation-cure system requires sophisticated laboratory facilities, an asset simply not available to every player in the coil coating market.

20.     Sherwin-Williams has made the investments necessary to develop its cutting edge and new to the market radiation-cure system in terms of equipment, employee talent, and laboratory facilities.  As to equipment, Sherwin-Williams has invested over $1 million dollars in equipment *alone* and alongside additional capital investments.  As to employee talent, Sherwin-Williams started the development of its radiation-cure system with a single person (that being Muns) in early 2020, but has since expanded the employee group dedicated to this systems such that it is one of Sherwin-Williams' largest innovation and development teams.  As to laboratory facilities, Sherwin-Williams has the benefit of well-stocked, advanced laboratories (including in Minneapolis, Minnesota, where Muns worked) that teams could use to develop and test their radiation-cure products**.**

**B.**     **Sherwin-Williams Owns and Protects Trade Secrets Related to its Radiation-Cure Coil Coating System.**

21.     Sherwin-Williams' significant and extended investment in its radiation-cure technology and related systems has generated substantial trade secrets related to its coil coating business, all of which are intimately known to Muns as a result of her work directly developing Sherwin-William's radiation-cure coil system and her team's enhancement of the same.  Those trade secrets include, among others:[1]

a.     The chemical compositions and formulations of each of the multiple layers of coating included in Sherwin-Williams' radiation-cure coil coating system, including the raw materials (and proportions of raw materials) required for desired effects and attributes;

b.     Techniques for the application of Sherwin-Williams' radiation-cure coil coating system to rolled steel, such as roll coater pressure, speeds, directions, and location;

c.     Results and insights bred from of years of tests, trial and error, and developmental efforts to create and improve Sherwin-Williams' radiation-cure coil coating system and the process for applying coatings to rolled steel, including the "negative know-how" generated in the testing and trial processes;

d.     Testing processes, procedures, and markers necessary to evaluate the quality, durability, adhesion, and gloss of a radiation-cured coil coating;

e.     The identities of reliable suppliers, contractors, and business partners capable of creating and delivering specialized raw materials, hardware, and machinery necessary for the creation and application of a radiation-cure coil coating system; and

---

[1] Sherwin-Williams pleads the asserted trade secrets to the extent that the information can be stated in a publicly filed pleading without impacting Sherwin-Williams' rights.

   f. Information about the unique demands, specifications, requirements, and manufacturing capabilities of some of Sherwin-Williams' most significant customers, including Sherwin-Williams' most significant and prolific customers in the coil-coating industry that use, among other things, radiation-cure coil coating at the core of their business.

  22. These trade secrets are exceptionally valuable to Sherwin-Williams because they are not generally known, cannot be easily developed, and give Sherwin-Williams a competitive edge in the marketplace.  Due to the complexities of the process and the high financial barrier to entry, Sherwin-Williams is one of only a few companies that even offers radiation cure technology for commercial products delivered to end users.

  23. Having so heavily invested in the development of its radiation-cure coil coating system, Sherwin-Williams has implemented extensive measures to ensure that its trade secrets stay exactly where they belong—with Sherwin-Williams.

  24. ***First***, Sherwin-Williams has implemented multiple, company-wide policies—each applicable to *all* Sherwin-Williams employees—affirming its employees' confidentiality obligations and setting expectations for the proper handling of its trade secret information:

   a. Sherwin-Williams' Code of Conduct emphasizes an employee's "duty to protect" the company's confidential information and trade secrets—including research and development, product formulas, and other sensitive business information—"from misuse and unauthorized disclosure."  All employees (including Muns) are required to review and affirm Sherwin-Williams' Code of Conduct each year.

   b. Sherwin-Williams' Trade Secret Policy sets forth the company's requirements for handling trade secrets, particularly as to research and development

information. Employees must "apply the highest level of security controls and care" to protect research and development information from disclosure, including by storing information "with appropriate levels of physical, technical and administrative security," including locks, multi-factor authentication, and physical access restrictions. Pursuant to that policy, employees may share research and development information "only" on a "need-to-know basis internally" and "through secure" or otherwise approved means. Employees found to have violated any part of the Trade Secret Policy are subject to discipline, including termination, and to criminal charges where appropriate.

25. **Second**, and in addition to policies applicable to all employees, Sherwin-Williams requires those with access to certain trade secrets to execute confidentiality, non-competition, and/or non-solicitation agreements, such as those containing terms similar the ones included in Muns' Employee Agreement. Those agreements prohibit the unauthorized use and disclosure of trade secret and confidential information, ensure that an employee cannot leave Sherwin-Williams for a competitor (thus bringing trade secret information with them), and provide that an employee cannot solicit customers of Sherwin-Williams on behalf of any competitor.

26. **Third**, many of Sherwin-Williams' vendors, suppliers, contractors, and customers—and, specifically, those involved in supporting the radiation-cure coil coating system—are required to execute non-disclosure agreements prohibiting the disclosure of trade secret or confidential information that those entities may access in the course of their business relationship with Sherwin-Williams.

27. **Fourth**, Sherwin-Williams relies on physical controls to limit access to certain trade secrets and other resources. For example, a Sherwin-Williams key card is required to access Sherwin-Williams' laboratories, including the Minneapolis, Minnesota laboratory where Muns

worked.  Access to those laboratories is limited to employees whose work responsibilities require access to the restricted locations.

28.    *Fifth*, Sherwin-Williams imposes electronic restrictions on trade secret and other confidential information in order to reduce the number of, and control the type of, employee with access to that information.  For example, Sherwin-Williams requires passwords to access company computers, ensuring that only company personnel will have access to electronically-stored trade secret documents and information and that only those who need to have such access to perform their job duties are permitted access to certain trade secrets.

29.    *Sixth*, Sherwin-Williams also takes steps to protect its trade secrets and other assets when employees leave the company.  In particular, Sherwin-Williams requires its employees to return "all Sherwin-Williams property," including "records, whether paper or electronic, and equipment" upon their departure.

**C.    Muns' Employment with Valspar and Sherwin-Williams.**

30.    The Valspar Corporation hired Muns as an Associate Chemist in Valspar's Coil R&D group in August 2014.

31.    At the time she was hired, Muns had no training or experience in radiation cure technology, particularly as applied to coil coatings.

32.    Sherwin-Williams acquired Valspar in June 2017 and, in doing so, inherited Muns and other legacy-Valspar employees into its workforce.

33.    Muns continued in the role of Associate Chemist until March 22, 2018, when Sherwin-Williams offered Muns a promotion to a Chemist II role.  The offer came with a 20% raise, an increased vacation allotment, and stipend to assist in her relocation from Garland, Texas

to Minneapolis, Minnesota, where she joined Sherwin-Williams's Coil Coatings Group.  Muns accepted the promotion offer.

34.    Sherwin-Williams offer of a raise and promotion was specifically conditioned on Muns signing an offer letter and an "Employee Agreement [that] includes a two-year non-competition and non-solicitation clause."  *See* Exhibit B (Offer Letter).  Muns executed both her offer letter and Employee Agreement the next day.

35.    Muns' Employee Agreement contained a number of material provisions specifically designed to protect Sherwin-Williams's "Confidential Information," which Muns' Agreement defines as:

> **trade secrets** and other information not generally known, which is **proprietary to Sherwin-Williams** and which derives independent economic value from not being generally known or readily ascertainable by proper means, **including**, but not limited to, **information about Sherwin-Williams' customers, processes and products**, including information relating to research, development, manufacture, purchasing, accounting, engineering, marketing, merchandising, selling, leasing, servicing, finance and business systems and techniques, intellectual properly, or similar information of a third-party who has entrusted such information to Sherwin-Williams.

Exhibit A (Muns' Employee Agreement) at ¶ 1 (emphasis added)

36.    One of those provisions includes Muns' 24-month non-competition covenant.  As set forth in her Agreement, Muns promised that, during the two years following her separation, she would not accept a role or perform work for a competitor that was in the same business or product line she developed for Sherwin-Williams:

> I will not, directly or indirectly, engage in any activities for, accept employment with, or render any services to a Conflicting Organization (as defined below) anywhere in the world in which the Sherwin-Williams business unit(s) for which I have worked conducted business during the last 24 months of my employment.

Exhibit A  (Muns' Employee Agreement) at ¶ 2(b).

a.     A "Conflicting Organization" is one that "is or will become engaged in research relating to, or development, production, marketing, selling, or servicing, a Conflicting Product."  Exhibit A  (Muns' Employee Agreement) at ¶ 2(e).

b.     A "Conflicting Product" is a "coating, product, formula, process, system or service of any organization other than Sherwin-Williams which is the same as or similar to, or otherwise competes with, any coating, formula, product, process, system, or service upon which I worked or about which I acquired Confidential Information during my employment with Sherwin Williams."  Exhibit A  (Muns' Employee Agreement) at ¶ 2(f).

37.     Another of key provision in Mun's Employee Agreement is her agreement not to solicit Sherwin-Williams' customers.  Muns promised Sherwin-Williams that, for two years following her separation, she would not "solicit in competition with Sherwin-Williams" any of the customers with which she developed close working relationships during her employment with Sherwin-Williams:

I will not, directly or indirectly, solicit or assist in soliciting in competition with Sherwin-Williams the business of any customer, prospective customer, client or prospective client (i) with whom I had personal contact or dealings on behalf of Sherwin-Williams during the one-year period directly preceding the termination of my employment with Sherwin-Williams; (ii) with whom employees directly or indirectly reporting to me have had contact or dealings on behalf of Sherwin-Williams during the one-year period immediately preceding the termination of my employment with Sherwin-Williams; (iii) for whom I had direct or indirect responsibility during the one-year period directly preceding the termination of my employment with Sherwin-Williams; or (iv) about whom I acquired Confidential Information during my employment with Sherwin-Williams.

Exhibit A  (Muns' Employee Agreement) at ¶ 2(c).

38.     Muns understood the reason for these covenants, further affirming in her Agreement that the restrictions were "reasonable in duration, territory, and scope of activity" and that they were "necessary to protect" Sherwin-Williams' business:

I acknowledge that the provisions of this Agreement are reasonable in duration, territory, and scope of activity, and necessary to protect Sherwin-Williams' legitimate business interests, including, but not limited to, its Confidential Information, and customer, vendor, supplier and business partner relationships, and goodwill. If any of the provisions contained in this Agreement are found to be unreasonable or excessively broad as to duration, territory, or scope of activities by a court of competent jurisdiction, I agree that, and along with Sherwin-Williams hereby request that, such court should modify or limit any overly broad provision so as to make it reasonable and enforceable under applicable law.

Exhibit A  (Muns' Employee Agreement) at ¶ 4.

39.     Having acknowledged as much, Muns further affirmed that any breach or violation of her restrictive covenants would warrant injunctive relief and that, if Sherwin-Williams commenced "any action" against Muns "for breach of" the Employee Agreement, "Sherwin-Williams *shall* be entitled to recover its reasonable attorneys' fees and costs."  Exhibit A  (Muns' Employee Agreement) at ¶ 6 (emphasis added).

**D.     Muns is Reassigned to the Radiation-Cure Team and Develops Sherwin-Williams' Trade Secrets.**

40.     In March 2020, one of Sherwin-Williams' customers contacted Sherwin-Williams to ask about the company's capabilities in offering a radiation-cure coil coating system.  Sherwin-Williams had no meaningful capabilities at that time, but identifying the opportunity at hand, decided to invest in the development of such a system.

41.     Soon after, Sherwin-Williams tapped Muns to lead the company's development of a radiation-cure coil coating system, which she worked on almost exclusively beginning in the spring of 2020.

42.     Initially, Muns was the only person assigned to the development of radiation-cure coil coating system on a full-time basis.  However, based on promising results and high potential for the project, Sherwin-Williams continued to invest and promote the research efforts that Muns

undertook. Eventually, Sherwin-Williams grew Mun's team into one of the largest developmental groups in the entire company.

43. With no training or experience in radiation cure processes or technologies, Muns learned completely on the job and at Sherwin-Williams' expense.

44. Muns officially worked out of Sherwin-Williams' Minneapolis, Minnesota laboratory, creating and testing formulations of coating that would be applied to rolled steel coil and finished via radiation curing.

45. Muns also spent significant time at customer sites, often to observe trials of Sherwin-Williams' products and processes on customer products using customer-owned machinery. In particular, Muns worked hand-in-glove with Sherwin-Williams' largest customer, Steel Dynamics, Inc. ("SDI"), to tailor Sherwin-Williams' radiation-cure coil coating system to work most effectively on SDI's machinery and for its particular need, which primarily was for coating steel garage doors. Muns frequently interacted with SDI and has collaborated closely with a number of SDI employees in order to understand their in-house process and to deliver a high-quality system to what quickly became Sherwin-Williams' largest customer for this product. Muns' observations and interactions with SDI deepened her knowledge of Sherwin-Williams' radiation-cure coil coating system *and* SDI's particular radiation-cure equipment and process, which is unique to SDI and the products it manufactures.

46. By 2023, Muns had become Sherwin-Williams' leading expert in the radiation-cure coil coating system, having built the company's program, products, and innovative offerings from the ground up.

47.     As a result, she was intimately familiar with the trade secrets owned by Sherwin-Williams related to this project—in fact, she created many of them, backed with years of valuable support and investment from Sherwin-Williams.

48.     On July 26, 2023, Muns accepted the position of R&D – Senior Group Leader in Sherwin-Williams' Wood Coating business unit.  As part of the Wood Coating business unit, Muns continued to use radiation-cure technology on products for application on various materials (for example, vinyl plank flooring).

**E.      Muns' Resigns from Sherwin-Williams to Accept a Role with Akzo's Research and Development Group.**

49.     Muns resigned from her role with Sherwin-Williams effective May 22, 2024.

50.     On that same date, Muns sent a text message to Bill Hartford, the lead Sales Director for Sherwin-Williams' radiation-cure coil coating initiative, to tell him that she was leaving Sherwin-Williams and that she had accepted a position at Akzo's Research and Development facility in Strongsville, Ohio.

51.     That same day, still Muns' last day of employment with Sherwin-Williams, Hartford received a phone call from a contact at SDI, who asked whether Hartford knew that Muns had left Sherwin-Williams and was starting a position with Akzo.

52.     On information and belief, Akzo notified SDI that it had hired Muns, one of Sherwin-Williams' leading innovators (and one of Sherwin-Williams' primary contacts with SDI) in order to jump-start its radiation-cure coil coating business.

53.     According to Akzo's website,[2] the company's Strongsville, Ohio Research and Development facility "includes specialized laboratories for innovative … coil coatings research,"

---

[2]           https://www.akzonobel.com/content/dam/akzonobel-corporate/global/en/regional-assets/north-america/united-states/united-states-facts-sheets/akzonobel-facility-sheet-strongsville-1023.pdf

houses "[m]etal coatings research and development" activities, and will support Akzo's "Coil and Extrusion Coatings" segment—exactly the type of facility and environment conducive to Muns' work to develop radiation-cured coil coating products for Akzo's benefit.

54. Akzo historically has competed with Sherwin-Williams only in thermal-cure coil coatings and wood coatings. Akzo had not developed the products sufficient to compete with Sherwin-Williams' radiation-cure coil coating system—but, with Muns on the roster, it expects to do so in the near term and already started its outreach by soliciting one of Sherwin-William's most significant customers.

55. Upon information and belief, and based upon Muns' and Akzo's representations, Akzo intends for Muns to work in research and development related to radiation-cure coil coatings, which is a role that is substantially similar to the one that she held at Sherwin-Williams.

56. Whether or not she is focused on radiation-cure technology, Muns cannot perform in *any* research and development role in a coil coatings role without inevitably using, relying on, and disclosing to others at Akzo the trade secret information that she learned and developed while working for Sherwin-Williams. Muns inevitably will disclose that information to Akzo as part of her day to day job duties, and to advance Akzo's entry into this new market space.

57. Concerned for the confidentiality of its trade secret information, Sherwin-Williams immediately contacted Akzo regarding Muns' restrictive covenants and obligations to Sherwin-Williams. *See* Exhibit C (Letter to C. van Meer, Attachments Omitted).

58. Akzo responded via phone call to Sherwin-Williams, confirmed that it had hired Muns *despite* being advised of her restrictive covenants, and advised that the company had postponed Muns' intended start date, which was June 10, 2024. Akzo nonetheless notified Sherwin-Williams that, irrespective of Muns' non-competition covenant and other restrictive

covenants, it intended to move forward with Muns' hire and that she would start work on June 17, 2024.

**Count I: Breach of Contract**
***Sherwin-Williams v. Muns***

59.     Sherwin-Williams incorporates by reference all preceding paragraphs.

60.     The Employee Agreement is a valid and enforceable contract between Muns and Sherwin-Williams.  It arose out of an offer, supported by consideration in the form of a promotion, pay raise, increased vacation benefit and relocation benefits, that Muns chose to accept by signing the agreement and working in her promoted role.

61.     Muns has breached the non-compete provision set forth in her Employee Agreement as alleged in this Complaint.

62.     The Employee Agreement states that, for a period of 24 months following her last day as a Sherwin-Williams employee, Muns "will not … accept employment with … a Conflicting Organization … anywhere in the world in which the Sherwin-Williams business unit(s) for which I have worked conducted business during the last 24 months of my employment."

63.     Muns accepted a position of employment with Akzo while still working for Sherwin-Williams.   She is expected to begin work on June 17, 2024.

64.     Akzo is a "Conflicting Organization" as that term is defined in Muns' Employee Agreement.

65.     Akzo competes with Sherwin-Williams with respect to Coil Coatings and Wood Coatings in the U.S. market and, in particular, in the State of Ohio.  Muns worked in Sherwin-Williams' Coil Coatings and Wood Coatings business units during the last 12 months of her employment with Sherwin-Williams.

66.     Akzo further has demonstrated its intent (including by hiring Muns) to compete with Sherwin-Williams in the U.S. market and, in particular, in the State of Ohio with respect to radiation-cured coil coating products and processes, which Sherwin-Williams developed within its Coil Coatings business unit.

67.     Muns also has breached the customer non-solicitation provision of her Employee Agreement.

68.     The Employee Agreement states that, for a period of 24 months following her last day as a Sherwin-Williams employee, Muns "will not, directly or indirectly, solicit or assist in soliciting in competition with Sherwin-Williams the business of any customer" with which Muns had "personal contact or dealings on behalf of Sherwin-Williams in the year prior to her separation; for which she had "direct or indirect responsibility" in the year prior to her separation; or "about whom [she] acquired Confidential Information during [her] employment with Sherwin-Williams."

69.     Muns' solicited, whether directly or indirectly via Akzo, SDI—a Sherwin-Williams customer with which she had personal dealings and direct responsibility and about which she has Confidential Information—in competition with Sherwin-Williams around the time of her separation, if not before.

70.     Sherwin-Williams at all times has performed its obligations under the Employee Agreement.

71.     Muns therefore breached her Employee Agreement by accepting a position of employment with Akzo and by soliciting SDI "in competition with" Sherwin-Williams.

72.     Muns agreed that, in "any action brought by Sherwin-Williams against [her] for breach of [the Employee Agreement], Sherwin-Williams shall be entitled to recover its reasonable attorneys' fees and costs."

73.     Muns therefore is liable, in connection with her breach of the Employee Agreement, for "reasonable attorneys' fees and costs" incurred by Sherwin-Williams in the preparation and commencement of this litigation, in addition to actual financial damages resulting from her breach of her non-competition and non-solicitation obligations.

### Count II: Misappropriation of Trade Secrets
### (Ohio Uniform Trade Secrets Act)
### *Sherwin-Williams v. Muns*

74.     Sherwin-Williams incorporates by reference all preceding paragraphs.

75.     Muns acquired Sherwin-Williams' trade secrets—including the chemical formulation of the components of Sherwin-Williams' radiation-cure coil coating system and the other trade secrets identified herein—in connection with her employment with Sherwin-Williams, and in particular as part of her roles in Sherwin-Williams' Coil Coatings business unit.

76.     Muns acquired the trade secrets under a duty to limit their use and maintain their secrecy.

77.     Sherwin-Williams' trade secrets are not generally known outside of company.

78.     Sherwin-Williams derives significant financial benefit from its trade secrets and those trade secrets have independent economic value precisely because they are kept a secret and not disclosed or known.

79.     Sherwin-Williams has taken reasonable measures to protect its trade secrets, including by promulgating multiple company-wide policies prohibiting the misappropriation of trade secrets and confidential information; limiting, by technological and physical means, access to trade secrets belonging to Sherwin-Williams; requiring employees to execute confidentiality agreements and other restrictive covenants to preclude disclosure of trade secret information; insisting that vendors, contractors, and customers execute non-disclosure agreements providing

that those entities cannot disclose any trade secret information they may come to learn; and requiring employees to return all materials to Sherwin-Williams upon their departure.

80.     As Muns has accepted, and intends to begin, employment with Akzo in a similar role that she held at Sherwin-Williams, she will misappropriate Sherwin-Williams' trade secrets by wrongfully and inevitably using them in her employment at Akzo, and divulging them to other employees at Akzo.  The disclosure of Sherwin-Williams' trade secrets is inevitable given (1) Akzo's stated intent to enter into the radiation-cure coil coating market and compete with Sherwin-Williams for the same customer(s); (2) the material overlap between Muns' former role, where she led Sherwin-Williams' development of a radiation-cured coil coating system, and her prospective role where she will lead the development of the same product and technology for Akzo, such that Muns will be unable to compartmentalize Sherwin-Williams' trade secrets from her other general knowledge and experience; and (3) the strong likelihood that Akzo, Muns' prospective new employer, will take little or no action to ensure that Muns does not divulge Sherwin-Williams' trade secrets, given that Akzo hired Muns specifically for the purpose of developing this business for Akzo and refused to withdraw its offer of employment to her.

81.     Muns' use of Sherwin-Williams' trade secrets in connection with this employment at Akzo, and her disclosure of those trade secrets to Akzo, is and will be without Sherwin-Williams' express or implied consent.

82.     Muns' unauthorized use of Sherwin-Williams' trade secrets poses a serious threat to Sherwin-Williams' business.

83.     By reason of Muns' improper and illegal use and disclosure of Sherwin-Williams' trade secrets, Sherwin-Williams will suffer damages to its business, loss of sales, loss of goodwill, loss of profits, loss of competitive advantage, and loss of corporate property.  In addition, Akzo

and Muns will be unjustly enriched by reason of Muns' improper and illegal use and disclosure of Sherwin-Williams' trade secrets.

84.     By reason of Muns' improper and illegal use and disclosure of Sherwin-Williams' trade secrets, Sherwin-Williams will suffer irreparable harm that cannot be adequately remedied at law unless Muns is enjoined from beginning her employment at Akzo.

85.     Sherwin-Williams also is entitled to recover exemplary damages and its attorneys' fees and costs.

**Count III: Misappropriation of Trade Secrets**
**(Defend Trade Secrets Act)**
***Sherwin-Williams v. Muns***

86.     Sherwin-Williams incorporates by reference all preceding paragraphs.

87.     Muns acquired Sherwin-Williams' trade secrets—including the chemical formulation of the components of Sherwin-Williams' radiation-cure coil coating system and the other trade secrets identified herein—in connection with her employment with Sherwin-Williams, and in particular as part of her roles in Sherwin-Williams' Coil Coatings business unit.

88.     Muns acquired the trade secrets under a duty to limit their use and maintain their secrecy.

89.     Those trade secrets are not generally known outside of Sherwin-Williams.

90.     Sherwin-Williams derives significant financial benefit from its trade secrets and those trade secrets have independent economic value precisely because they are kept a secret and not disclosed or known.

91.     Sherwin-Williams has taken reasonable measures to protect its trade secrets, including by promulgating multiple company-wide policies prohibiting the misappropriation of trade secrets and confidential information; limiting, by technological and physical means, access

23

to trade secrets belonging to Sherwin-Williams; requiring employees to execute confidentiality agreements and other restrictive covenants to preclude disclosure of trade secret information; insisting that vendors, contractors, and customers execute non-disclosure agreements providing that those entities cannot disclose any trade secret information they may come to learn; and requiring employees to return all materials to Sherwin-Williams upon their departure.

92. As Muns has accepted, and intends to begin, employment with Akzo, she will misappropriate Sherwin-Williams' trade secrets by wrongfully and inevitably using them in her employment at Akzo, and divulging them to other employees at Akzo. The disclosure of Sherwin-Williams' trade secrets is inevitable given (1) Akzo's stated intent to enter into the radiation-cure coil coating market and compete with Sherwin-Williams for the same customer(s); (2) the material overlap between Muns' former role, where she led Sherwin-Williams' development of a radiation-cured coil coating system, and her prospective role where she will lead the development of the same product and technology for Akzo, such that Muns will be unable to compartmentalize Sherwin-Williams' trade secrets from her other general knowledge and experience; and (3) the strong likelihood that Akzo, Muns' prospective new employer, will take little or no action to ensure that Muns does not divulge Sherwin-Williams' trade secrets, given that Akzo hired Muns specifically for the purpose of developing this business for Akzo and refused to withdraw its offer of employment to her.

93. Muns' use of Sherwin-Williams' trade secrets in connection with this employment at Akzo, and her disclosure of those trade secrets to Akzo, is and will be without Sherwin-Williams' express or implied consent.

94. Muns' unauthorized use of Sherwin-Williams' trade secrets poses a serious threat to Sherwin-Williams' business.

95. By reason of Muns' improper and illegal use and disclosure of Sherwin-Williams' trade secrets, Sherwin-Williams will suffer damages to its business, loss of sales, loss of goodwill, loss of profits, loss of competitive advantage, and loss of corporate property.  In addition, Akzo and Muns will be unjustly enriched by reason of Muns' improper and illegal use and disclosure of Sherwin-Williams' trade secrets.

96. By reason of Muns' improper and illegal use and disclosure of Sherwin-Williams' trade secrets, Sherwin-Williams will suffer irreparable harm that cannot be adequately remedied at law unless Muns is enjoined from beginning her employment at Akzo.

97. Sherwin-Williams also is entitled to recover exemplary damages and its attorneys' fees and costs.

## Count IV: Tortious Interference with Contract
### Sherwin-Williams v. Akzo

98. Sherwin-Williams incorporates by reference all preceding paragraphs.

99. The Employee Agreement is a valid and enforceable contract between Muns and Sherwin-Williams.

100. That Agreement prohibits Muns from accepting employment with a "Conflicting Organization" within two years of her separation from Sherwin-Williams.  Akzo is a "Conflicting Organization" as that term is defined in Muns' Employee Agreement.

101. Muns is prohibited by her Employee Agreement from accepting a position of employment with Akzo.

102. Akzo hired Muns despite knowing that the restrictive covenants stated in her Employee Agreement preclude Muns from working for Akzo in the role for which she was hired.

103.    The Agreement also prohibits Muns from soliciting for any competitor any customer with whom she had "personal contact or dealings" with in the year prior to her separation from Sherwin-Williams.

104.    Muns is prohibited by her Employee Agreement from directly or indirectly soliciting SDI "in competition with" Sherwin-Williams.

105.    Upon information and belief, Akzo nonetheless solicited SDI "in competition with" Sherwin-Williams by leveraging Muns' hire.  Akzo's conduct constitutes indirect solicitation by Muns.

106.    Further, and by hiring Muns into a coil coating role virtually identical to the one that she held at Sherwin-Williams, Akzo has demonstrated that it intends for Muns to communicate with and solicit customers—including SDI and other customers of Sherwin-Williams—on behalf of Akzo.

107.    Upon information and belief, Muns informed Akzo of her Employee Agreement, and the non-competition and customer non-solicitation provisions contained in it, at or around the time Akzo extended her an offer of employment.

108.    Separately, on May 30, 2024, before Muns began her employment with Akzo, Sherwin-Williams sent to Akzo a copy of Muns' Employee Agreement, together with a detailed explanation of Muns' post-employment obligations.  *See* Exhibit C (Letter to C. van Meer, Attachments Omitted).  That correspondence put Akzo on notice of Muns' Employee Agreement and post-separation obligations to Sherwin-Williams.

109.    Akzo lacks any justification for its conduct, as Akzo has no legally protected interest in unlawfully employing Muns.

110.    Sherwin-Williams will suffer damages as a result of Akzo's interference in Muns' performance of her Employee Agreement, including as a result of her inevitable disclosure of Sherwin-Williams' trade secrets to Akzo during the course of her employment.

## PRAYER FOR RELIEF

111.    Sherwin-Williams respectfully requests that the Court enter an order:

a.    Declaring that Muns has breached her Employee Agreement with Sherwin-Williams by accepting a position of employment with Akzo;

b.    Declaring that Muns has breached her Employee Agreement with Sherwin-Williams by directly or indirectly soliciting customer(s) of Sherwin-Williams;

c.    Declaring that Muns has misappropriated or has threatened to misappropriate Sherwin-Williams's trade secrets;

d.    Preliminarily and permanently enjoining Muns from beginning employment with Akzo and from misappropriating Sherwin-Williams' trade secrets, and issuing other related orders in service of the protection of Sherwin-Williams' contractual rights and trade secrets;

e.    Awarding damages for breach of contract to be proven at trial;

f.    Awarding damages (including actual and compensatory damages, unjust enrichment, reasonable royalties, and exemplary damages) for misappropriation to be proven at trial;

g.    Awarding damages (including actual and compensatory damages, unjust enrichment, and exemplary damages) for interference with Muns' Employee Agreement to be proven at trial;

   h.  Awarding "reasonable attorneys' fees and costs" incurred by Sherwin-Williams in connection with litigation, pursuant to the terms of Muns' Employee Agreement;

   i.  Awarding pre- and post-judgment interest; and

   j.  Granting such other and further relief as the Court deems appropriate and just.

Date: June 12, 2024       Respectfully submitted,

            */s/ Ryan B. McCrum*
            Ryan B. McCrum
            Ohio ID No. 0071519
            rbmccrum@jonesday.com
            JONES DAY
            901 Lakeside Avenue
            Cleveland, OH 44114
            Tel: (216) 586-3939

            Steven M. Zadravecz
            (motion for admission *pro hac vice* forthcoming)
            szadravecz@jonesday.com
            JONES DAY
            3161 Michelson Drive, Suite 800
            Irvine, CA  92612
            Tel:  (949) 851-3939

            Katherine J. McLay
            (motion for admission *pro hac vice* forthcoming)
            kmclay@jonesday.com
            JONES DAY
            500 Grant Street, Suite 4500
            Pittsburgh, PA 15212
            Tel:  (412) 391-3939

            *Counsel for Plaintiff The Sherwin-Williams Company*